IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRADFORD C. SMITH          :     CIVIL ACTION
                           :
            v.             :
                           :
COUNTY OF CHESTER          :     NO. 12-130
                           :

MEMORANDUM

Dalzell, J.                                  March 21, 2013

        Bradford C. Smith brings this action against the

County of Chester alleging that the County discriminated against

him based on his age and retaliated against him for filing

complaints with the Equal Employment Opportunity Commission

(EEOC) and the Pennsylvania Human Relations Commission (PHRC).

        Specifically, Smith alleges that by not promoting him

to be a full-time park ranger one because of his age, the County

violated the Age Discrimination in Employment Act (ADEA), 29

U.S.C. § 621, et seq. (Count One) and the Pennsylvania Human

Relations Act (PHRA), 43 P.S. § 951 et seq. (Count Two).  Comp.

¶¶ 94-108.  Smith also alleges that in retaliation for his

complaint with the EEOC the County graded him as failing a

weapons qualifying exam.  The County also allegedly removed

Smith's duty belt, failed to timely schedule him to retest for

his duty belt, failed to return his duty belt after he

successfully completed the test, failed to approve his annual

review, and failed to provide him with one-on-one training after he did not pass his first test.  Comp. ¶¶ 110-111; Pl. Reply at 7.  Smith alleges that through those acts the County violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. (Count Three) and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. (Count Four).  Comp. ¶¶ 109-117.

In order to bring suit under the ADEA or the PHRA, a plaintiff must first exhaust his administrative remedies.  See, e.g., Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997).  Plaintiff has met the exhaustion requirement here.  See Comp. Ex. 6, 10-14 (EEOC and PHRC filings and correspondence).

The County avers that "Plaintiff's claims in the instant action do not arise out of the 2003 interview and hiring process."  Def. MSJ at 3 n.3.  According to Smith's complaint, he applied to be a full-time Regional Park Ranger in 2003, 2005, and 2006, and he does not distinguish among these applications in his discrimination claim.  Instead, incorporating paragraphs that encompass all three applications, Smith avers that the County violated the ADEA "by refusing to hire Plaintiff for the Regional Park Ranger due to his age", Comp. ¶ 95.  He also claims that when he applied to be a Regional Park Ranger he was

2

"between the ages of 53-56", Comp. ¶ 96, implying that his claim encompasses all three applications.

But in order to meet the exhaustion requirement, Smith must have first filed a complaint with the EEOC within one hundred and eighty days of the allegedly unlawful employment practice.  29 U.S.C. § 626.  Smith did not file an EEOC complaint at all until 2006, and so his claim regarding any allegedly illegal conduct in 2003 is time-barred.  We will thus read Smith's complaint as addressing only the 2005 and 2006 applications and the County's allegedly retaliatory conduct in 2006.

If a plaintiff has timely filed a charge with the EEOC, the Commission may issue a right-to-sue notice, and a plaintiff has ninety days from the date of receipt of that notice to file a lawsuit.  See, e.g., McCray v. Corry Mfg. Co., 61 F.3d 224, 227 (3d Cir. 1995).  The EEOC issued a right-to-sue notice in this case on October 25, 2011[1], see Right-to-Sue Notice, Comp. Ex. 13, and Smith does not dispute that he received it in due course.  He filed this action on January 11,

---

[1] We cannot ignore the reality that the prodigious delay between the events in question and the issuance of this letter rests entirely with the EEOC where Smith's claim reposed for more than five-and-a-half years.  As will be seen below in note 6, such delays have evidentiary consequences.

2012, within the ninety-day window, and the action was thus timely filed.

We exercise jurisdiction over Smith's ADEA claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Smith's PHRA claims pursuant to 28 U.S.C. § 1367.

The County of Chester moves for summary judgment on all counts.  Def. MSJ at 1.

I.   Standard of Review

A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact", Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.

4

A factual dispute is genuine

> [I]f the evidence is such that a reasonable
> jury could return a verdict for the
> nonmoving party. . . . The mere existence of
> a scintilla of evidence in support of the
> plaintiff's position will be insufficient;
> there must be evidence on which the jury
> could reasonably find for the plaintiff.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).

A fact is "material" if it "might affect the outcome of the suit

under the governing law". Id. at 248.

We "must draw all reasonable inferences in favor of

the nonmoving party, and [we] may not make credibility

determinations or weigh the evidence." Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), cited in Amour

v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001)).

## II.  Facts

### A.  Undisputed Facts

Smith was born on January 2, 1950, and in June of 1998

-- when he was forty-eight years old -- the County of Chester

hired him as a part-time park ranger in its Parks and Recreation

Department.  Def. MSJ ¶¶ 3-4; Pl. Reply in Opp. ¶¶ 3-4.  The

part-time park ranger position involved enforcing laws and park

regulations, providing assistance to visitors, and park patrol.

The County issued each ranger a duty belt, which included handcuffs and a firearm.  Def. MSJ ¶ 5-6; Pl. Reply ¶ 5-6.

While Smith was working as a part-time ranger he maintained a full-time job as the owner and operator of Laurel Printing and Advertising, Inc., where he worked between sixty and seventy hours per week.  Def. MSJ ¶ 9; Pl. Reply ¶ 9.

In 2000, Smith also took a job as a Deputy Waterways Conservation Officer with the Pennsylvania Fish and Boat Commission.  This job required him to "complete 80 hours of patrol time and 20 hours of patrol with a full-time WCO" every year.  Pl. Reply ¶ 10; see also Def. MSJ ¶ 10.

K. Owen Prusack, the superintendent at the Chester County park where Smith worked, testified that Smith "was a good employee . . . He met expectations.  He did the job.  I believe his evaluations probably reflected that he did that.  He was middle of the road, a good employee."  Prusack Dep., Pl. Reply Ex. 3 at 27:7-11.  But the County points to two incidents that "put in question [Smith]'s judgment regarding his conduct and competency with firearms as well as his relationship with female officers in the Department."  Def. MSJ ¶ 11.

In 2001 Smith attended a ranger meeting while wearing civilian clothes and carrying a .45 caliber gun for which he had

a "carry conceal permit."  Smith Dep., Pl. Reply Ex. 2 at 28:25-29:8.  The gun was tucked in his pants in the small of his back, but his shirt was tucked in, so when he sat down, he took the gun out, put it on the table, untucked his shirt, and put the gun back in his pants.  Id. at 29:8-12.  The County investigated the incident, but Smith did not suffer any adverse employment consequences as a result.  Id. at 30:11-20.  Smith notes that his subsequent annual review did not mention the incident.  See Pl. Reply Ex. 5, 2002 Yearly Evaluation for Bradford Smith.[2]

The County next mentions an incident in which Smith believed he was scheduled to open the park, but when he arrived he found that a female employee was in fact scheduled to open it.  Rather than leave, he accompanied her as she made her rounds.  Smith Dep., Def. MSJ Ex. A at 32:13-19.  The employee then complained to Prusack that "she felt sexually uncomfortable around Brad and she wanted somebody to talk to him about it."

---

[2] Smith avers that, according to this performance review, he "exceeded standards" because he received a "2.76 out of 3.00". Pl. Reply ¶ 11(a).  It appears that, in 2002, the County used a scale of 1.00 to 5.00, where 1.00 is the highest score.  See 2002 Performance Review, Pl. Reply Ex. 5, at Smith Bates 40.  A score of 2.76 appears to fall in the range of 2.50 to 3.499, which corresponds to "Meets Expectations".  See Pl. Reply Ex. 5 at Smith Bates 40.  The 2006 performance review template suggests that in 2006 the County used a scale of 1 to 3, in which 3 was the highest, and corresponded to the category of "Exceeds Standards".  See, e.g., 2006 Review, Pl. Reply Ex. 8. The 2006 standard is not relevant to Smith's 2002 evaluation, where he received a score of "Meets Expectations".

Prusack Dep. at 27:17-21.  She told Prusack that Smith made her uncomfortable with his "innuendo and maybe verbal, something verbal, nothing physical."  Id. at 28:4-6.  Prusack spoke to Smith, but because the female employee did not want Prusack to take any disciplinary action he did not.  Id. at 28:24-29:18.

In October of 2003, the County posted job listings for two full-time Regional Park Ranger positions.  Pl. Reply ¶ 12; Chester County Open Job Listing, Pl. Reply Ex. 6.  Smith applied for a full-time regional park ranger position with the County through a two-stage panel interview process.  Def. MSJ ¶ 12; Pl. Reply ¶ 12.  Smith did not receive the position.  The County instead hired Cathy Zeigler and Robert Lewis, who were both in their late thirties.  Def. MSJ ¶ 13; Pl. Reply ¶ 13.

In 2005, Smith again applied for a full-time ranger position and was selected for an interview with a six-person panel.  Def. MSJ ¶¶ 14-15; Pl. Reply ¶¶ 14-15.  According to the County, in October of 2005 the hiring panel interviewed between six and eight people for two open positions.  John Mikowychok, the Director of Parks and Recreation, described the hiring process, which had been in effect "at least since 2001".  Mikowychok Dep., Pl. Ex. 11 at 27:21.  As Mikowychok explained, the process involved a thirty-minute written test in which

applicants responded to a hypothetical scenario involving challenges a park ranger could face.  The hiring panel then reviewed those responses. Mikowychok Dep. at 26:3 - 27:2.  The application also involved a panel interview process.  The panel asked all candidates the same questions, ordered "randomly in a cycle", whereby "if [the panel] started off and [] there's five persons interviewing, the first person asks question one and then when the next candidate came in, the second person asked question one."  Id. at 28:3-7.  See also Def. MSJ ¶ 17; Hesser Dep. at 78:22-79:5 (explaining that the panel asked each applicant the same twenty questions and graded the applicants on the same scale).

During the interview, the panel asked Smith why he was applying for a full-time job when he owned a printing business, and Smith recalls, "My response would have been that the printing business is going belly up, where better to put my efforts to find employment as a full-time position than something I've been doing part time for all those years."  Smith Dep., Def. MSJ Ex. A, 48:1-5.

Smith did not get the job.  The County hired Cathy Pavolic, who was also a part-time ranger, and John Conlow.  Both were thirty-seven years old.  Def. MSJ ¶¶ 14-15; Pl. Reply ¶¶

14-15.  Two members of the panel were Pavolic's direct

supervisors.  Def. MSJ ¶ 16; Pl. Reply ¶ 16; Smith Dep. at

49:15-19.  The parties dispute the facts concerning the basis

for the panel's decision, as discussed below.

On January 13, 2006, the County again sought to hire a

full-time regional park ranger.  Def. MSJ ¶ 18; Pl. Reply ¶ 18.

Smith applied but was told the County would not interview him

because "there had been 'no appreciable difference in [his]

status' since his last interview."  Def. MSJ ¶ 19.[3]

---

[3] In his reply, Smith argues,

> It is denied that 'there had been no
> appreciable different [sic] in [his] status'
> since Smith's last interview.  Smith
> obtained tactical training with East
> Vincent, West Vincent, and East Coventry
> Police Departments in a full-day session
> subsequent to his last interview, but prior
> to notifying Karen Hesser of his interest in
> the Nottingham position.

Pl. Reply ¶ 19.  But the County's assertion that Smith was told
he would not receive an interview because there had been no
change in his status since he last applied is based on Smith's
averment in his complaint that "Plaintiff was told by Mr. Owen
Prusack (Park Superintendent), Mr. John Spencer (Regional Park
Ranger) and Ms. Vicky Rhine (Regional Park Ranger) that he would
not be interviewed for this vacancy because there had been 'no
appreciable difference in [his] status' since his last
interview."  Comp. ¶ 35.  Because Smith's denial does not
actually contradict the County's statement in paragraph nineteen
of its summary judgment motion -- the County states that Smith
was told he would not be interviewed because there had been no
change in his status, it does not address whether there had in
fact been a change in Smith's status -- and because Smith

In March of 2006, Smith was obliged to pass weapons qualifications tests because he carried a firearm as part of his part-time job with the County,  Def. MSJ ¶ 21; Comp. ¶ 41.  On March 1, 2006, Smith failed a dim light weapons qualification test.  Pl. Reply ¶ 22; March 21, 2006 County of Chester Interoffice Memorandum, Pl. Reply Ex. 14.

On March 3, 2006, Smith filed a charge against the County for ADEA violations with the United States EEOC.  Comp. ¶ 37; Def. MSJ ¶ 33.  He cross-filed the charge with the PHRC. Comp. ¶ 38.

The next day Smith took additional weapons qualifications tests: he passed the daylight qualification test, but he failed the tactical qualification test.  Id.  Robert McAllister, the test administrator, allowed Smith to attempt the tactical qualification test a second time that day, and Smith again failed.  See March 21, 2006 County of Chester Interoffice Memorandum, Pl. Reply Ex. 14.  On March 8, 2006, Smith was offered a third chance to take the tactical qualification test, which he again failed.  Id.  The County thus required Smith to turn in his duty belt, his firearm, hand-cuffs, pepper spray, and baton on March 8, 2006.  Pl. Reply ¶ 23; Def. MSJ ¶ 23.

---

himself made this assertion in his Complaint, we will take it as true for purposes of resolving the instant motion.

McAllister concluded after Smith's third attempt that "Based on my observations and opinion, Brad has a significant deficiency in his understanding and application of the justifiable use of deadly force as it pertains to Pennsylvania law.  I recommend re-training in this area before additional range attempts at qualification are made or reinstatement of carry status occurs."  March 21, 2006 County of Chester Interoffice Memorandum, Pl. Reply Ex. 14.

On March 29, 2006, Smith took another "qualifying shoot" test, Pl. Reply ¶ 24, which he passed.[4]  The County scheduled Smith's re-test of his tactical shoot for May 11, 2006, and he passed that re-test.  Id.  In her deposition, Pavolic testified that when she failed a weapons qualification test, she "spent time practicing with the firearms instructor" and was scheduled for a subsequent test "[m]ost likely less than a month" after she had failed.  Pavolic Dep., Pl. Reply Ex. 8, 20:7-9; 21:2.

On June 8, 2006, Smith's supervisor, John Spencer, wrote a performance review of Smith, which Spencer and Smith both signed.  See June 8, 2006 Review, Comp. Ex. 7.  After

---

[4] This test appears to be a second attempt at the test Smith failed on March 1.  Smith distinguishes in his reply between "qualifying shoots" and "tactical shoots", and the only non-tactical qualifying shoot he failed took place on March 1, 2006. See Pl. Reply ¶ 22.

reading the review, Mikowychok advised Spencer "to put language in there to include the emphasis on improving his firearm proficiency."  Mikowychok Dep., Pl. Reply Ex. 11, 54:5-8. Spencer then submitted a revised review, dated July 5, 2006, which Spencer and Smith both signed.  July 5, 2006 Review, Pl. Reply Ex. 8.  That review mentioned Smith's need to improve his firearm proficiency.  Id. at 2.

On August 4, 2006, the County issued a reclassification memorandum in which it explained that on July 22, 2006 the County had officially reclassified all part-time Park Rangers as "Park Technicians".  Job Re-Classification Letter, Pl. Reply Ex. 17.  As a result of the change, part-time rangers were to stop wearing conventional duty belts and return to the County all firearms, batons, handcuffs, and other defensive equipment.  Id.

Mikowychok testified that in light of the reclassification he believed that Spencer should remove the language regarding improving firearm proficiency from Smith's performance review:

> I said there's no point in keeping this
> requirement of him for the new year.  It's
> now moot . . . he wouldn't have to take this
> training.  So there's no point in keeping it
> in there and having him contact ready or at
> community college and pay some fee and go
> through the training for naught.

Mikowychok Dep. at 58:3-11.

When Spencer prepared a revised review, Smith refused to sign it: "I signed [the July 5 version].  It went away. Came back again.  More changes.  I refused to sign it.  To me, it was harassment.  The changes that were made could have been made with the first one."  Smith Dep., Pl. Reply Ex. 2, 78:22-79:1.

Smith avers, and the County does not dispute, that by August 13, 2006 the County had not returned Smith's duty belt. Pl. Reply ¶ 27.[5]

On January 15, 2007, Smith began working as a full-time security guard for Montgomery County.  Smith Dep. at 75:23-76:1.  At the time, Smith was also working for the Pennsylvania Fish and Boat Commission and continuing to run his printing business.  Id. at 76:7-16.  Smith testified that he found that "the Chester County job was too rigidly structured to fit in with everything else", id. at 77:9-10, and so he voluntarily resigned.  Id. 77:9-10.  Notably, the County did not terminate Smith.  Def. MSJ ¶ 28; Pl. Reply ¶ 28.

_____

[5] Smith in fact writes in paragraph twenty-seven of his reply that he had not received his duty belt by August 13, 2012, but since he refers to this as being "almost three months" after he passed his firearm qualifications, we will assume the year is a typographical error.

B. <u>Disputed Facts Regarding Hiring Process</u>

1. <u>Defendant's Account</u>

The County contends that the decision not to hire Smith full-time in 2005 had nothing to do with age. Indeed, according to the County, "Plaintiff's age was not considered when determining to make a promotion and the panel members do not have candidates' dates of birth." Def. MSJ ¶ 17. In support, the County cites the deposition of Karen Hesser, who was the Deputy Director of the County's Parks and Recreation Department at the time. <u>See</u> Hesser Dep., Def. MSJ Ex. B, at 70:15-71:7; 79:6-12 ("the decision not to hire Mr. Bradford Smith was not based on his age. Again, at no time was the applicant's age discussed, evident, or otherwise requested of the applicants. The decisions for hire are based solely on education, training and experience, and performance during the interview.").

In his deposition, Mikowychok explained that the panel made decisions based on the interview scores, the review of the responses to the hypothetical scenarios, and the applicant's demeanor during the interview. As to this last factor, Mikowychok said the panel took demeanor into account because of the public interaction inherent in the park ranger position:

15

"[T]hese are our front line people.  These are the people that are meeting the park people firsthand, having discussions with them . . . ."  Mikowychok Dep. 29:20-22. He explained that the score sheets are "typically disposed of within about six months", id. at 27:11-12.

The County maintains that "[a]fter the scores were totaled, Plaintiff was ranked in the fourth or fifth position based on the scores he received and each panel member voted on the most qualified candidate."  Def. MSJ ¶ 17.  The County selected Pavolic and Conlow because they were "the most qualified based upon their education, experience and performance in the interview."  Id., citing Hesser Dep. at 79:10-16.

## 2. Plaintiff's Account

Smith argues that "age was the determining factor in why he did not receive[] the promotion to full-time Regional Park Ranger."  Pl. Reply. ¶ 16.  The facts he points to in support of this conclusion are that "[t]he only difference between a part-time Park Ranger and a full-time Park Ranger were administrative/management skills", and that "Pavolic did not testify to having any prior supervisory experience, and specifically stated that her bartending, and fitness instructor positions were not supervisory.  Likewise, the massage and

16

conditioning business she owned and operated had no employees or independent contractors." <u>Id.</u> ¶ 16.

Smith contrasts this with <u>his</u> management experience, which he says spanned about fifteen years and included "positions such as Plant Manager (Quality Packaging Supply Co.), Printing Manager (Hargro Flexable Packaging), Printing Coordinator (Bryce Corporation), and Operation Manager (Mink Company, Inc.), amongst many others, including owning and operating a printing business." <u>Id.</u> ¶ 16; Smith Resume, Pl. Reply Ex. 9.  Smith also notes that the seven other regional park rangers were all between the ages of twenty-seven and forty.  Pl. Reply ¶ 17.[6]

With regard to the weapons qualifications tests, Smith suggests that one adverse employment action he suffered was that while Pavolic received retraining from the firearms instructor after she failed a weapons qualifying exam, he did not.  <u>See,</u>

_____

[6]As Smith points out, the County did not produce the interview scores during discovery, but Smith filed no motion for us to draw an adverse inference from it under Fed. R. Civ. P. 37(b)(2)(A)(i) or (ii).  In any event, it seems undisputed that the County's six-month document retention policy led to the destruction of these records long before the EEOC got around to issuing its right-to-sue letter.  Since the scores would have been tallied at the panel interview of September 20, 2005, Def. MSJ ¶ 14; Pl. Reply ¶ 14, it is entirely possible that the County destroyed these records before it even knew about the EEOC claim.  This may explain Smith's failure to seek the relief Rule 37 affords.

17

e.g., id. ¶ 24.  Smith does not aver that he requested

retraining.  Instead, Smith suggests that he did not receive the

same treatment as Pavolic because McAllister was unwilling to

train him, saying "it wasn't [McAllister's] place to conduct

retraining", id. ¶ 24.  In fact, McAllister's deposition does

not make clear whether McAllister thought it wasn't his place to

personally re-train Smith or whether he thought it wasn't his

place to authorize re-training.  McAllister testified,

> I was hoping somebody would [handle that re-
> training] . . . Would at least -- at least
> come back to me and say, you know, you make
> it happen for him or whatever.  You know,
> but it really wasn't my -- wasn't my place
> to do that.  Because it would involve, you
> know, would involve money and time and
> everything else.  So it wasn't my call.

McAllister Dep., Pl. Reply Ex. 15, 52:22 - 53:5.


III.   Analysis

     A. The Age Discrimination in Employment
        Act of 1967 and the Pennsylvania Human Relations Act

        The ADEA makes it "unlawful for an employer . . . to

fail or refuse to hire or to discharge any individual or

otherwise discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of

employment, because of such individual's age", 29 U.S.C. § 623.

The same legal standards and analysis govern the ADEA and the

PHRA, see, e.g., Glanzman v. Metropolitan Management Corp., 391 F.3d 506, 509 n.2 (3d Cir. 2004); cf. Bailey v. Storlazzi, 729 A.2d 1206, 1214 (Pa. Super. 1999).  Our ADEA analysis will thus apply to Smith's PHRA claims as well.

An employer is liable under the ADEA if an employee's age "actually motivated the employer's decision", and so an employee "cannot succeed unless the employee's protected trait actually played a role in th[e employer's decisionmaking] process and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

In Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), the Supreme Court held that the burden-shifting framework established in Price Waterhouse v. Hopkins, 490 U.S. 228 (2008) and made applicable to mixed-motive Title VII claims did not apply to claims under the ADEA.[7]  Instead, an ADEA-alleging plaintiff retains the burden of persuasion, and he must "prove by a preponderance of the evidence (which may be direct

---

[7] Under the burden-shifting framework established in Price Waterhouse, after a plaintiff asserting a claim under Title VII has shown that his membership in a protected class played a role in an adverse employment decision, the defendant may avoid liability "only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the protected factor] into account."  Price Waterhouse, 490 U.S. at 258.

or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Gross, 557 U.S. at 177-78.

Though the Supreme Court "has not definitively decided whether the evidentiary framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), utilized in Title VII cases is appropriate in the ADEA context", Gross, 557 U.S. at 175 n.2, our Court of Appeals applies the McDonnell Douglas burden-shifting framework to ADEA claims. See, e.g., Kautz v. Met-Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005); Smith v. City of Allentown, 589 F.3d 684, 689-91 (3d Cir. 2009). That framework applies to such claims as follows: in order to survive a motion for summary judgment on an age discrimination claim, a plaintiff must first put forward "evidence . . . sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case," Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001) (internal quotations omitted), and an ADEA plaintiff can make that case either through direct or indirect evidence of discrimination. Fasold v. Justice, 409 F.3d 178, 183-84 (3d Cir. 2005). If a plaintiff relies on indirect evidence in making his prima facie case, his claim is analyzed under the McDonnell Douglas burden-shifting framework. See, e.g., Kautz, 412 F.3d at 465.

20

As our Court of Appeals explained in _Stanziale v._
_Jargowsky_, 200 F.3d 101 (3d Cir. 2000), under _McDonnell Douglas_,
after the plaintiff has established a _prima facie_ case,

> the burden of production (but not the burden
> of persuasion) shifts to the defendant, who
> must then offer evidence that is sufficient,
> if believed, to support a finding that the
> defendant had a legitimate,
> nondiscriminatory reason for the [adverse
> employment decision].  An employer need not
> prove, however, that the proffered reasons
> actually motivated the [employment]
> decision.

_Stanziale_, 200 F.3d at 105 (internal quotations and citations
omitted).

If the employer produces a legitimate, non-
discriminatory reason (or reasons) for the employment action,
the burden then shifts back to the plaintiff, who must prove by
a preponderance of the evidence that the employer's proffered
reasons are mere pretext.  _Duffy_, 265 F.3d at 167 n.1.  A
plaintiff may do this by producing evidence "from which a
factfinder could reasonably either (1) disbelieve the employer's
articulated legitimate reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or
determinative cause of the employer's action."  _Stanziale_, 200
F.3d at 105.

The <u>McDonnell Douglas</u> framework applies to both claims of discrimination and retaliation under the ADEA.  <u>Barber v. CSX Distribution Services</u>, 68 F.3d 694, 701 (3d Cir. 1995); <u>cf. Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000) (<u>McDonnell Douglas</u> burden-shifting framework applies to both discrimination and retaliation claims under the ADA).

We consider Smith's discrimination and retaliation claims in turn.

B.  <u>Smith's Claim Of Discrimination Under The ADEA</u>

1.  <u>Smith's Prima Facie Case</u>

Smith alleges a failure to promote claim in violation of the ADEA, which, as our Court of Appeals has held, is analogous to a failure to hire claim.  <u>Barber</u>, 68 F.3d at 698. Thus, in order to establish a <u>prima facie</u> case of age discrimination, Smith must show that he: "(1) was a member of a protected class, i.e., that [he] was over forty, (2) is qualified for the position, (3) suffered an adverse employment decision, (4) and was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination", <u>Duffy</u>, 265 F.3d at 167; <u>see also</u> <u>Barber</u>, 68 F.3d at 698.

With regard to his 2005 application, Smith has shown
that he was fifty-five years old when he applied for the
position.  He appears to have been qualified, in that he had
been serving as a part-time park ranger for about eight years,
and had about six years of related experience with the
Pennsylvania Fish and Boat Commission.  Before working as a
part-time ranger, Smith had about fifteen years of management
experience.  He was not promoted to the position of full-time
park ranger, and instead the two candidates who were hired were
both thirty-seven years old.

We find that Smith has made a prima facie case of
discrimination under the ADEA, and so the burden of production
shifts to the County to offer evidence sufficient to "support a
finding that the defendant had a legitimate, nondiscriminatory
reason", for not promoting Smith.  Stanziale, 200 F.3d at 105.
We note that the County need not prove "that the proffered
reasons actually motivated" the decision.  Id.

## 2.  The County's Response

The County identifies several bases for its decisions
not to promote Smith.  First, it points to two incidents that
"put in question [Smith's] judgment," Def. MSJ ¶ 11 -- one in
which Smith put his gun on the table at an employee meeting and

23

another which gave rise to a complaint by a female employee. Def. Mem. in Supp. of MSJ at 2.

Next, the County emphasizes that when Smith applied for the full-time position in 2005, the panel interviewed him and five to seven other people for two available positions. Def. Mem. at 4.  The County notes that the panel asked all of the candidates the same questions and each panel member graded each candidate.  After the scores were totaled, Smith was in the fourth or fifth position based on the scores he received.  Id. The County avers that "[t]he applicants selected were hired because they were the most qualified based upon their education, experience and performance in the interview."  Id.

As our Court of Appeals has explained, "[a]n employer may not use evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated", Kautz, 412 F.3d at 468, but the criteria here do not violate this standard.  As Mikowychok explained in his deposition, the written component required applicants to respond to hypothetical scenarios involving several stressful challenges that a ranger might encounter, such as "a conflict at a pavilion where two groups are vying for the same spot at the same time" or if there is "a rabid raccoon in another area of the same park."

Mikowychok Dep. at 26:10-14.  An applicant's ability to respond
to these challenges is related to his potential performance in
the role of park ranger.

Furthermore, Mikowychok noted that the committee
considered the applicants' "general conduct at the interview" --
including whether they were comfortable and how well they spoke.
Id. at 29:11-13.  Mikowychok explained that this conduct was
relevant to job performance because park rangers spend a good
deal of time interacting with the public.  Id. at 29:13-24.

In explaining why Smith may not have performed as well
as other applicants during the interview, the County notes that
when Smith was asked why he was applying for a full-time park
ranger position while he was running his own business, Smith
said that his business was failing.  Def. Mem. at 4.  This
comment could have given a negative impression in an interview
-- even viewed in the light most favorable to Smith, who
suggests that he mentioned the failing business only to explain
how he would have time for a full-time position.  See Smith
Dep., Pl. Reply Ex. 2 at 47:24-48:5.

Finally, as a further explanation of Smith's interview
performance relative to Pavolic's, the County notes that "the
panel which interviewed the applicant's [sic] for the full time

25

position in 2005 included two individuals who at the time were Ranger Pavolic's direct supervisors." Def. Mem. at 3.  Smith seems in his deposition to suggest that the supervisor's familiarity with Pavolic was somehow improper:

> [Guy Donatelli]: Is it your contention that Ms. Pavolic was selected for that position because two members of the interview panel were her supervisors?
>
> [Bradford Smith]: It would be in her best interest that they were her direct supervisors.
>
> Q:  Because it's likely that direct supervisors would favor someone they know versus someone they might not know?
>
> A:  I would have to say yes.

Smith Dep., 49:23-50:6.  But the ADEA does not make actionable an employer's basing hiring decisions on his familiarity with an applicant's job performance.

In 2006, Smith was told that he would not be interviewed because "[h]e had been afforded two interview opportunities prior to that and the County saw no marked improvement which would justify considering him as a candidate at that time." Def. Mem. at 9.

Thus, the County points to three legitimate, non-discriminatory reasons for not promoting Smith: (1) his actions during his employment twice raised questions about his judgment;

(2) in 2005, Smith received lower scores in the application process than did the two applicants who were selected based on their performances on their written tests and in their interviews; and (3) in 2006, Smith was told he would not receive an interview because there had been no change in his status since his last two applications.

Because the County has met its burden of producing legitimate, nondiscriminatory reasons for not promoting Smith in 2005 and 2006, the burden shifts back to Smith to prove by a preponderance of the evidence that each of these reasons is pretextual.

### 3.  Smith's Evidence of Pretext

As our Court of Appeals explained in Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994) -- which remains its seminal case on pretext -- a plaintiff may meet his burden at the third stage of McDonnell Douglas by "either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Id. at 764 (emphasis in original).

Here, Smith has produced no evidence, either circumstantial or direct, "that discrimination was more likely than not a motivating or determinative cause" of the County's decision not to promote him.  Instead, Smith aims to demonstrate pretext by discrediting the proffered reasons through circumstantial evidence.

As our Court of Appeals has explained, the "standard for proving pretext [] 'places a difficult burden on the plaintiff.'"  Kautz, 412 F.3d at 467 (quoting Fuentes, 32 F.3d at 765).  In order to prove that there is a genuine issue of material fact about pretext sufficient to survive a summary judgment motion,

> the non-moving plaintiff must demonstrate
> such weaknesses, implausibilities,
> inconsistencies, incoherencies, or
> contradictions in the employer's proffered
> legitimate reasons for its action that a
> reasonable factfinder could rationally find
> them unworthy of credence and hence infer
> that the employer did not act for the
> asserted non-discriminatory reasons.

Fuentes, 32 F.3d at 765 (internal quotations and alterations omitted).  In other words, "he must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  Keller, 130 F.3d at 1109.

28

Moreover, <u>Fuentes</u> explained that in order "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that <u>each</u> of the employer's proffered non-discriminatory reasons was either a <u>post hoc</u> fabrication or otherwise did not actually motivate the employment action", <u>Fuentes</u>, 32 F.3d at 764 (citations omitted) (emphasis in original).[8]

As our Court of Appeals explained, "We have applied the principles explained in <u>Fuentes</u> to require plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." <u>Kautz</u>, 412 F.3d at 467.  Smith identifies the County's proffered reasons as "Defendant's allegation that (1) Plaintiff scored fourth or fifth in the interview process, and (2) that Plaintiff's sole reason for wanting the full-time position was because his printing business was going under."  Pl. Mem. in Supp. of Reply at 15.

---

[8] <u>Fuentes</u> did note that it was possible that where an employer had offered "a bagful of legitimate reasons" for its actions, <u>id.</u> 32 F.3d at 764 n.7, a plaintiff could sufficiently discredit the employer and survive summary judgment by demonstrating the illegitimacy of some, but not all, of the proffered reasons, but the County has not presented a "bagful" of reasons here.

But we would characterize the County's proffered reasons with regard to the 2005 application process as (1) Smith's past conduct -- specifically, placing his gun on a picnic table during an employee meeting and making inappropriate comments to a female colleague -- raised questions about the soundness of his judgment; and (2) Smith scored lower than other candidates in the interview process for a number of reasons -- including his comment regarding his printing business.  With regard to the 2006 application, the County contends that it did not interview Smith for the promotion because there had been no meaningful change in his status since his last interview.

Regarding the incident involving the gun and the use of inappropriate innuendo with a female colleague, Smith responds that, after those incidents, the superintendent at the County park where Smith worked testified that Smith "met expectations" as an employee.  Pl. Reply ¶ 11.  Smith also points out that the subsequent annual review he received did not mention the incidents, and he argues -- erroneously, as discussed above in note 1 -- that he received a performance evaluation of "exceeded standards."  Id.  But rather conspicuously Smith does not challenge the accuracy of the facts underlying the County's accounts regarding the gun or his

30

interaction with his female colleague.  Bearing in mind that under Fuentes the proffered reason need not have "actually motivated the [employment] decision," Stanziale, 200 F.3d at 105 (emphasis added), Smith has not succeeded in discrediting this justification.

More significantly, even if Smith were able to discredit that justification he would not demonstrate pretext and thus survive summary judgment for the basic reason that he has not discredited the core of the County's response -- that he did not perform as well as the other candidates during the 2005 application process.

Smith argues that we should "disbelieve Defendant's articulated reason of Plaintiff's performance in the interview process because Plaintiff in fact was more qualified for the Regional Park Ranger position than Cathy Pavolic."  Pl. Mem. at 17.  Smith argues that at the time of the interview, "Pavolic had worked as a Park Ranger for merely half the time that Plaintiff did."  Id.  At the time of Pavolic's promotion, Smith had worked part-time for the County for about eight years, and Pavolic had worked in a similar position for about three and a half years.  Pl. Mem. at 3 (citing Pavolic Dep., Pl. Reply Ex. 8 at 11:7-9).

Smith also argues that the County's assertion that he performed less well than Pavolic in the application process is pretextual because he had more management experience than she did: while Pavolic had worked exclusively in non-managerial positions, he had "fifteen years of supervisory experience." Id. at 17.

But these distinctions do not show that the County's decision "was so plainly wrong that it cannot have been the employer's real reason" for not promoting Smith. Keller, 130 F.3d at 1109. Instead, Smith's allegations that his credentials were superior to Pavolic's amount to a criticism of the soundness of the County's decision. As our Court of Appeals has emphasized, unless an employer's evaluation methods are so disconnected from the employee's activities as to be contradictory to the employer's stated purpose, we are not to second-guess those methods. See, e.g., Kautz, 412 F.3d at 468. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (internal quotations and alterations omitted).

32

Aside from his naked contention that he was more qualified for the job, Smith has pointed to no evidence that the real reason the County promoted Pavolic was discriminatory animus toward Smith.

With regard to his 2006 application, Smith challenges the County's contention that his application had not changed. He argues that after the 2005 interview he took tactical training with several police departments.  Pl. Reply ¶ 19.  This assertion is insufficient to render the County's contention that his application had not changed in any relevant way so "plainly wrong" as to be obviously pretextual.

We therefore find that Smith has failed to carry his burden of showing that the County's justifications for its decision not to promote him were pretextual, and that the real reason it did not promote him was age-based discrimination.

C.   Smith's Claim of Retaliation Under the ADEA

The ADEA also provides that "It shall be unlawful for an employer to discriminate against any of his employees . . . because such [employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).  The PHRA contains a cognate anti-retaliation provision, see 43 Pa.

33

Cons. Stat. § 955(d), and we analyze it under the same framework.  See Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) ("The language of the PHRA is . . . substantially similar to [the ADEA] anti-retaliation provisions, and we have held that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently").  Furthermore, in evaluating an ADEA anti-retaliation claim, we may look to Title VII precedent as our Court of Appeals has held that because of the similarity among the anti-retaliation provisions of the ADEA, the ADA, and Title VII, "the precedent interpreting any one of these statutes is equally relevant to interpretation of the others."  Id.

        Here, Smith alleged in his complaint that the County retaliated against him for his March 3, 2006 EEOC filing by (1) failing him in a subjective evaluation of his performance on a weapons qualifying exam; (2) removing his duty belt; (3) failing to timely schedule Plaintiff to retest for his duty belt until May of 2006 -- two months after he failed the initial qualifying exam, while other rangers retook their tests within one month; (4) failing to return his duty belt after he successfully completed the test in May, while other rangers were able to wear

their duty belts until August of 2006; and (5) failing to approve his annual review.  Comp. ¶¶ 110-111.  In his response to the County's motion for summary judgment, Smith raises the additional argument that the County failed to provide him with one-on-one training after he failed his first test, though other rangers received such training when they failed.  Pl. Reply at 7.

### 1. Smith's Prima Facie Case

In order to establish a prima facie case of retaliation under the ADEA, a plaintiff must show: "(1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action."  Barber, 68 F.3d at 701.

Filing a complaint with the EEOC is protected conduct under 29 U.S.C. § 623.  In order to make out the second element of a prima facie case, a plaintiff claiming retaliation must "show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (quoting

Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 54
(2006)).

Three of Smith's claims fail the Burlington Northern
test for adverse employment action.  Specifically, we find that
Smith has failed to make a prima facie case with regard to the
timing of his re-testing, the failure of Mikowychok to approve
his annual review, and the lack of one-on-one training he
received after he failed the qualifying exam.

With regard to the timing of the testing, Smith
alleges that for one of the tests he failed -- the low/dim light
qualifying shoot -- he was re-tested within the month.  For the
tactical test, Smith was re-tested two months later: he failed
on March 4 though on May 11 he was re-tested and passed.  As a
consequence of the March 4 failure, Smith lost his duty belt,
Comp. ¶ 56, but he points to no other harm he suffered as a
result -- for example, he does not aver that his pay was
suspended or that his hours were reduced.  A delay in re-testing
of two months, when the typical timeframe Smith claims was one
month, and where the only adverse consequence was that he lost
his duty belt, simply is not the kind of employment action that
would discourage a reasonable worker from filing a
discrimination charge in the future.

As far as the approval of Smith's performance evaluation is concerned, Smith objected to signing a third evaluation saying that three iterations of his performance evaluation constituted "harassment" and arguing that "[t]he changes that were made could have been made with the first one." Smith Dep., Pl. Reply Ex. 2, 78:24-79:1.

Asking Smith to sign a third performance review does not constitute a materially adverse action.  The changes to the proposed third evaluation removed the recommendation that Smith improve his firearm proficiency (a change that would have been favorable to Smith), and such changes could not have been made to the earlier drafts that Spencer completed on June 8 and July 5, 2006 as the policy change of removing firearms from park rangers did not happen until July 22, 2006.  Park officials told the rangers of these changes on August 4, 2006.  Thus, the alteration to his review reflected, according to the undisputed record, a recent policy change.[9]

---

[9] Smith erroneously argues that "The second rejection [of the performance review] was completely unnecessary; Defendant wanted to add language to Plaintiff's annual review recommending that he obtain additional training in the use of force.  The motivation for this demand could only have been retaliatory, since by that time all enforcement responsibilities had been removed from the Plaintiff and individuals with his job title." Pl. Mem. at 21.  If Smith is referring to the changes Mikowychok recommended to Smith's June 8 performance review, it is not true that "all enforcement responsibilities had been removed" at this

Turning to the one-on-one training, Smith alleges that

> [A]fter Cathy Pavolic initially failed to
> pass her firearms qualifications, she stated
> that she spent multiple times practicing
> with the firearms instructor out on the
> range.  Exhibit 8, Pg. 20.  By contrast,
> Regional Ranger Robert McAllister, firearms
> instructor at the time, stated that it
> wasn't his place to conduct retraining when
> Smith was struggling to pass his firearms
> qualifications.

Pl. Reply ¶ 24.  In support of his contention that McAllister said it wasn't his place to conduct retraining, Smith points to McAllister's deposition testimony.  As we discuss above, this is a misleading account of that testimony.  The deposition does not make clear whether McAllister thought it was not "his place" to personally re-train Smith or whether he thought it was not "his place" to authorize re-training.  See McAllister Dep., Pl. Ex. 15, 52:22 - 53:15.  Smith does not aver -- nor, more to the point, does he point to any evidence in the record -- that he asked for re-training.  A failure of the County to offer re-training -- where Smith does not allege that the County was

time -- enforcement responsibilities were not removed until July 22, 2006.  If Smith is referring to the changes Mikowychok recommended to his July 5 performance review, he does not point to evidence to support the assertion that the language Mikowychok recommended was that "he obtain additional training in the use of force."  Instead, Mikowychok's deposition testimony suggests that he recommended changing the July 5 performance review to remove the requirement that Smith obtain additional training in the use of force.  See Mikowychok Dep. at 58:3-11.

obliged to offer it or that he requested it and was denied --
hardly constitutes an employment action that would lead a
reasonable employee to fail to file a complaint with the EEOC in
the future.  We therefore hold that Smith has failed to make a
prima facie case of retaliation with regard to this conduct.

We turn now to the remaining allegations -- that the
County retaliated against Smith by (1) failing him in a
subjective evaluation of his performance on a weapons qualifying
exam, (2) removing his duty belt, and (3) failing to return it
after he successfully completed the test in May of 2006.

The allegation that the County failed Smith, on what
he alleges was a subjective test, could constitute an adverse
employment action in that the prospect of such a failure could
dissuade a reasonable employee from opposing an employer's
unlawful practice.

With regard to Smith's loss of the duty belt and the
County's failure to return it, the determination of whether
these were adverse employment actions is less clear.  Smith
suffered no loss of income or change in hours as a result of
these actions, and any claim that the duty belt was so essential
to a part-time ranger's job that the prospect of its loss would
dissuade a reasonable employee from filing a charge is

undermined by the County's later decision to remove all part-time rangers' duty belts.  Nevertheless, the County does not contest that these could constitute adverse actions, and instead argues that Smith has failed to make a prima facie case because he has failed to demonstrate a causal connection between his age discrimination claim and these supposed adverse actions.  We will therefore consider the County's causal argument.  Def. Mem. at 10.

Specifically, the County cites the inconvenient fact that "Plaintiff's first weapons qualifications failure occurred on March 1, 2006 - **before** Plaintiff even filed his EEOC complaint."  Id. (emphasis in original).  Plainly, Smith cannot make a prima facie showing of retaliation for events that happened before he engaged in protected conduct, and so we will interpret his claim as encompassing only the tactical shooting test that he failed on March 4 and March 8, 2006.[10]

With regard to these tests, the County argues that these failures "were so close in time to his filing with the EEOC that there has been no evidence that the County was even aware of the claim."  Id.  This argument applies with equal

---

[10] It is important to note at the outset of our retaliation analysis that neither party has cited us to any record evidence of exactly when the County received notice of Smith's EEOC claim.

force to the removal of Smith's duty belt, which happened on
March 8, 2006.

In <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir.
1989), our Court of Appeals reasoned that temporal proximity
between an employee's protected conduct and an adverse
employment action could give rise to an inference of
retaliation.  There, the Court found that the plaintiff had
"demonstrated the causal link between the two by the
circumstance that the discharge followed rapidly, only two days
later, upon [the employer's] <u>receipt of notice</u> of [plaintiff's]
EEOC claim."  <u>Id.</u> (emphasis added).

In <u>Jalil</u>, the employer had received notice of the
charge of discrimination eleven days after the plaintiff had
filed it.  <u>Id.</u> at 703.  Here, Smith alleges that the County
retaliated against him by finding that he had not passed the
tactical test -- one administered only one day after he filed
the EEOC complaint -- and again four days later when he yet
again failed the test.  Unlike the plaintiff in <u>Jalil</u> -- who
alleged that his employer took an adverse action <u>after</u> learning
of his EEOC complaint -- Smith points to <u>no</u> evidence that the
County had notice of his EEOC charge.  <u>See also</u> <u>Moore v.
Shinseki</u>, 487 Fed. Appx. 697, 698 (3d Cir. 2012) (evaluating the

41

temporal proximity that would give rise to an inference of notice from the date the employer actually learned of the EEOC complaint).  Because Smith has identified no evidence that the County knew of his complaint from when he failed the tests to when it removed his duty belt, he has failed to establish the requisite causal link to make a _prima facie_ case that the County took these actions in retaliation for his filing of an EEOC complaint.

Regarding the duty belt, two months elapsed between the time Smith filed the EEOC complaint on March 3, 2006 and when he was denied his duty belt on May 11, 2006.  This period gives rise to an inference that the County knew of Smith's complaint when it did not return his belt.  We thus find that Smith has made a _prima facie_ case with respect to this aspect.

### 2.  The County's Response

Under _McDonnell Douglas_, the burden then shifts to the County to produce a non-retaliatory explanation for its conduct. The County asserts that it did not return Smith's duty belt because "shortly after he re-qualified the part time park rangers' duties were changed to eliminate the need for them to carry firearms."  Def. Mem. at 11.  The record indeed shows that Smith re-qualified in May of 2006, and two months later the no-

42

firearm change was approved and all part-time rangers were obliged to return their duty belts.  The County has thus offered a legitimate, non-discriminatory reason for its conduct.

### 3. Smith's Response

In order to carry his burden under McDonnell Douglas, Smith must either "(i) discredit[] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that [the prohibited reason] was more likely than not a motivating or determinative cause of the adverse employment action."  Fuentes, 32 F.3d at 764.

Smith has not adduced any evidence that retaliation was more likely than not a motivating or determinative cause of the County's failure to return his duty belt at a time when a policy change was imminent.  Instead, Smith attempts to discredit the County's asserted reason.  Smith denies the County's allegation that "On July 22, 2006, the County removed the responsibility of all part time park rangers, including Plaintiff, from carrying a duty belt and handgun", Def. MSJ ¶ 27, and counters that "[a] memo issued by Defendant and dated August 4, 2006 reclassified part-time Park Rangers" and that "[t]he new position removed the responsibility for carrying a duty-belt."  Pl. Reply ¶ 27.  But the letter Smith cites --

which he includes as an exhibit to his response -- says on its face that "On July 22, the Salary Board of Chester County approved [the Parks and Recreation Department's] plan to convert all part time Park Rangers . . . to a 'Park Technician' classification", and that this reclassification "carries with it the cessation of part time rangers wearing a conventional duty belt, with Use of Force tools."  Job Re-Classification Letter, Pl. Reply Ex. 17.

The evidence supports the County's assertion that by August 4, 2006 part-time rangers no longer carried a firearm or the traditional duty belt.  This indisputable fact of record undermines any inference of retaliation that Smith hopes we will draw from his assertion that "as of August 13, 20[06], almost three months elapsed since Brad passed his firearms qualifications, yet he still had not received his duty belt back", Pl. Reply ¶ 27.[11]

---

[11] The August 4, 2006 letter alludes to a "new, reduced-scope duty belt," see Job Re-Classification Letter, Pl. Reply Ex. 17 at 2, which Smith doesn't address here -- all allegations concerning the duty belt refer to Smith getting the duty belt "back" or having it "reissued", rather than failing to receive a new type of duty belt.  See, e.g., Pl. Reply ¶ 27; Pl. Mem. at 20 ("Defendant never returned Plaintiff's duty belt"); Comp. ¶ 61 ("Defendant never reissued Plaintiff's duty belt back to him").  It appears that Smith received a new, modified duty belt in October because he avers that "Plaintiff was without his [duty belt] for nearly five months", Pl. Mem. at 20, and he continued to work for the County until 2007.

Smith appears to contend that the difference between the speed with which other rangers got their belts back -- about one month -- and the delay in returning his belt discredits the County's non-discriminatory explanation.  Pl. Mem. at 20.  He argues, "Despite Plaintiff's successful [firearms] qualification, Defendant never returned Plaintiff's duty belt, even though Defendant's other part-time park rangers still wore their duty belts until August, 2006."  Id.  Smith does not address whether other part-time rangers lost their duty belts shortly before the policy change, and, if so, whether the belts were returned.

The contrast between the one month that Smith claims other rangers waited, and the three months that elapsed between when he passed the test and when the Department made the decision to eliminate duty belts in light of the Department's policy change, does not reveal such a weakness, implausibility, inconsistency, incoherency, or contradiction in the County's explanation that "a reasonable factfinder could rationally find [it] unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Fuentes, 32 F.3d at 765.

45

We therefore hold that Smith has failed to carry his burden under McDonnell Douglas of discrediting the County's argument so as to create a genuine issue of material fact regarding whether the County failed to return his duty belt constituted retaliation for his filing of an EEOC charge.

IV.  Conclusion

For the foregoing reasons, we will grant the County's motion for summary judgment as to all counts.

BY THE COURT:

/s/ Stewart Dalzell